**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 09a0694n.06

No. 08-5962

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**
**Oct 22, 2009**
LEONARD GREEN, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR THE |
| CHUN YA CHEUNG, | ) | EASTERN DISTRICT OF KENTUCKY |
| | ) | |
| Defendant-Appellant. | ) | |

Before: DAUGHTREY, SUTTON and McKEAGUE, Circuit Judges.

SUTTON, Circuit Judge. Chun Ya "Jerry" Cheung appeals his conviction for conspiring to harbor illegal aliens, alleging that testimony about conversations with those aliens and the admission of a video deposition of one of them violated his Sixth Amendment right to confront the witnesses against him. Finding one claim waived and no harm stemming from the other, we affirm.

I.

In 2006, Cheung opened the Empire Buffet restaurant in Crescent Springs, Kentucky, which he eventually owned in partnership with his cousin, Chun Dong Shi. Cheung owned several similar Chinese restaurants in the area, and he provided much of the capital and expertise to set up the Empire Buffet, but he left the day-to-day operations to Shi and Shi's wife, Xiu Yun Wang. Cheung

spent most of his time at the other restaurants, though he came in to help at the Empire Buffet from time to time.

In 2007, local police and officials from Immigrations and Customs Enforcement (ICE) began an investigation in nearby Villa Hills, Kentucky, after a neighbor reported a suspiciously large number of people living in a single-family home owned by Shi and Wang. At about 10:00 each morning, a white van licensed to the Empire Buffet would appear at the house, and a large number of individuals would enter the van to go to the Empire Buffet. Every night the van would return at about 10:00 or 10:30. Agent Roger Werner of ICE observed the same pattern at another restaurant Cheung owned in Florence, Kentucky: A white van would take workers from a house to the restaurant and back at roughly the same times as the Empire Buffet van would.

On October 16, 2007, local police and Agent Werner stopped the Empire Buffet van en route to the restaurant, then searched the house where the workers had been living. Four of the passengers, as well as another person the police found in the house, were illegal immigrants from Mexico.

Agent Werner went to the restaurant and asked to speak to the manager. Wang directed him to Cheung. When Agent Werner asked for the workers' I-9 forms, Cheung had none. Although he later produced some I-9 forms, Cheung never produced any forms for the five individuals in question. The Empire Buffet, it also turned out, had not paid unemployment taxes on the wages of any of these individuals.

ICE later discovered a sixth illegal immigrant, Juan Garcia Martinez, who worked at the Empire Buffet. Instead of staying in Shi and Wang's house, Martinez lived in an apartment apparently rented by Cheung across the street from the restaurant. Martinez pleaded guilty to misdemeanor entry without inspection, and the government held him beyond the expiration of his sentence on a material witness warrant. To allow Martinez to be released, the government deposed him on video shortly before trial, giving Cheung a chance to cross-examine Martinez before Martinez returned to Mexico.

Cheung stood trial on charges of harboring Martinez, *see* 8 U.S.C. § 1324(a)(1)(A)(iii), and for conspiring to harbor illegal aliens, *see id.* § 1324(a)(1)(v)(I), for commercial advantage or private financial gain, *see id.* § 1324(a)(1)(B)(i). At trial, the government presented the testimony of Agent Werner, a local police detective, Shi, Wang, Shi and Wang's neighbor, the landlord of the apartment leased by Cheung and an employment insurance tax auditor for the Commonwealth of Kentucky, as well as the deposition of Martinez. The defense presented Cheung, a former INS official who taught Cheung how to fill out I-9 forms after Werner's visit to the restaurant and an accountant who reviewed Cheung's files. The jury acquitted Cheung of harboring Martinez, but it convicted him of conspiring to harbor illegal aliens.

## II.

"In all criminal prosecutions," the Confrontation Clause says, "the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI. If the

government wishes to introduce the "testimonial" statements of an absent witness against a defendant, the Clause requires the government to prove that the witness is not available to testify and that the defense had a prior opportunity to cross-examine the witness. *Crawford v. Washington*, 541 U.S. 36, 68 (2004). Cheung argues that the government violated his confrontation rights twice: when Agent Werner testified about the immigration status of several aliens he interviewed and when it played the deposition of Martinez.

A.

The trouble with Cheung's first argument is that he consented to Agent Werner's testimony. Early on, the defense moved to exclude any statements the aliens had made to Agent Werner about their immigration status, but both sides came to an agreement about the issue before trial: Agent Werner would not testify "about the statements made during the administrative processing or the initial interview," but he would introduce printouts from ICE's central index system describing the particular individuals as "Entry Without Inspection." 3/31/08 Pretrial Conf. Tr. 3–5. When the government moved at trial to admit the printouts for Agent Werner to narrate, the defense said it had "[n]o objection." Tr. 71. Cheung thus waived any challenge to this testimony.

Cheung insists that Agent Werner overstepped the agreement by testifying not only to what the documents said but also to his conversations with the five individuals. Agent Werner described each of the five aliens he encountered on October 16, 2007. For the first one, he testified that, "[w]hen the file was created, [that person] was listed as EWI, which is entry without inspection."

- 4 -

Tr. 73. As Agent Werner progressed through the list, however, he described the status of the other four more tersely: "He's also entered without inspection. . . . He also entered—EWI. . . . He's also entered without inspection. . . . He also entered without inspection." As to the last four individuals, Cheung says, Agent Werner's testimony violated the Confrontation Clause, because testimony about "*actual* status," as opposed to the status "*when the file was created*," must have been "based upon [Agent Werner's] interrogation of these men." Cheung Br. 13. Invoking *United States v. Cromer*, 389 F.3d 662 (6th Cir. 2004), Cheung adds that Agent Werner's interrogation produced testimonial statements, because "a reasonable person in the position of the Mexican-nationals would understand that any statements they made could be used against the employers and themselves." Cheung Br. 15.

The distinction between "actual status" and status "when the file was created" is a fine one—so fine that Cheung did not object when Agent Werner shifted from one phrasing to the other. As we read the transcript, Agent Werner's testimony does not to refer to the interviews with the aliens but to the ICE documents that Cheung permitted Agent Werner to reference. In context, "[h]e's also entered without inspection" most naturally refers to the alien's status "when the file was created," which is the way Agent Werner described the first alien and which in short-hand form suggests a continuation of the same qualification. Imprecise perhaps, but it was not improper.

Even assuming that Agent Werner went beyond the agreement by repeating information from his interviews with the aliens and even assuming that the interviews were testimonial, all for the sake of argument, we could not reverse the district court for failing to stop Agent Werner on its own

initiative absent plain error. Yet any error was not "clear and obvious" but was at best "subject to

a reasonable dispute," *Puckett v. United States*, __ U.S. __, 129 S. Ct. 1423, 1429 (2009), for the

reasons already given. And because Agent Werner conveyed essentially the same information—the

aliens' entry status—whether he testified from the documents or from his conversations with them,

any error would not have "affected the outcome of the district court proceedings." *Id.* (quoting

*United States v. Olano*, 507 U.S. 725, 734 (1993)).

One more point before we turn to Cheung's second argument. In debating whether a

statement is testimonial, lawyers for the government and the defense have made a habit over the last

few years of citing *Cromer* for this proposition:

> The proper inquiry . . . is whether the declarant intends to bear testimony against the
> accused. That intent, in turn, may be determined by querying whether a reasonable
> person in the declarant's position would anticipate his statement being used against
> the accused in investigating and prosecuting the crime.

389 F.3d at 675. That may be the appropriate way to define "testimonial" in non-interrogation

settings, *see Crawford*, 541 U.S. at 51-52; *Melendez-Diaz v. Massachusetts*, ___ U.S. ___, 129 S.

Ct. 2527, 2531–32 (2009), but it is not the way the Court defined "testimonial" hearsay in *Davis v.*

*Washington*, 547 U.S. 813 (2006). *See id.* at 822 (holding that whether a statement made in response

to interrogation is testimonial depends on whether the objective purpose of the interrogation was "to

establish or prove past events potentially relevant to later criminal prosecution" or "to meet an

ongoing emergency"). The statements at issue in *Cromer* did not arise from a governmental

interrogation but from a confidential informant. 389 F.3d at 667–68, 675. The *Cromer* articulation

of "testimonial" hearsay is perfectly reasonable in that setting and is consistent with *Crawford*, but it does not seem to match *Davis*'s later definition of the term in the context of a governmental investigation or interrogation, as occurred here. Now that we have this additional guidance from the Supreme Court in the context of law enforcement questioning, litigants may wish to invoke *Davis* or at least explain why it does not apply.

## B.

Cheung preserved his second argument, but it meets the same fate. Showing the video deposition of Martinez, he contends, violated his confrontation right because Martinez was "available" for Sixth Amendment purposes. After Martinez asked to be released from his material witness warrant, the government video-recorded a deposition of his testimony and the defense cross-examined him. Then, over the defense's objection but with the court's approval, the government "released" or "deported" him approximately four days before trial. 3/21/08 Pretrial Conf. Tr. 13–16. (It is not clear whether he was merely "released," U.S. Br. 22, or "deported," U.S. Br. 17; *see also* 3/21/08 Pretrial Conf. Tr. 11 ("removed").)

For a witness to be "unavailable," the government must "have made a good-faith effort to obtain his presence at trial." *Barber v. Page*, 390 U.S. 719, 724–25 (1968). A good-faith effort, however, is not an ends-of-the-earth effort, and "'[t]he lengths to which the prosecution must go'" to obtain a witness generally amount to "'a question of reasonableness,'" *Ohio v. Roberts*, 448 U.S. 56, 74 (1980) (quoting *California v. Green*, 399 U.S. 149, 188 n.22 (1970) (Harlan, J., concurring)),

*overruled on other grounds by Crawford*, 541 U.S. 36; *compare Barber*, 390 U.S. at 723, *and United States v. Tirado-Tirado*, 563 F.3d 117, 123–25 (5th Cir. 2009), *with United States v. Allie*, 978 F.2d 1401, 1407 (5th Cir. 1992); *cf. United States v. Eufracio-Torres*, 890 F.2d 266, 270 (10th Cir. 1989).

We need not delve into the "unavailability" inquiry today, however, because any error in admitting the deposition did not harm Cheung's case. *See Chapman v. California*, 386 U.S. 18, 24 (1967). In gauging the risk of harm, the question is not what Cheung would have gained from confronting the witness at trial; it is what Cheung lost from having the deposition admitted. *See Coy v. Iowa*, 487 U.S. 1012, 1021–22 (1988). If a jury still would have convicted Cheung on the conspiracy charge "on the basis of the remaining evidence," *id.* at 1022, any error is harmless.

No harm occurred based on the admission of the Martinez deposition. Had the jury convicted Cheung of harboring Martinez, to be sure, that would be another story. For then, it would be difficult to say that the admission of Martinez's deposition was harmless, because the testimony went directly to that charge. Yet the jury acquitted Cheung on the harboring charge, and—given Agent Werner's testimony regarding the entry status of Martinez and the other aliens—the deposition had little bearing on his one conviction: conspiring to harbor an alien.

As to that charge, the existence of the conspiracy was not in doubt; the only question was whether Cheung joined it. All of the evidence concerning Cheung's involvement in the conspiracy came from sources other than the video deposition. Shi testified that he felt Cheung was his boss, and that Cheung told Shi and Wang to buy a home to house workers there. Shi testified that Cheung

helped him to negotiate the rates with the employment agency from which the illegal workers came. Wang testified that Cheung knew they kept all of the workers at her home, and that the restaurant was paying her and Shi to house them. Wang testified that there were illegal workers at the Empire Buffet from the beginning, when Cheung was most involved in that restaurant. Although Shi signed most of the restaurant's checks, Cheung also signed a number of them. Agent Werner testified about similar housing and transportation patterns he saw at another restaurant Cheung owned, suggesting the employment practices of the two restaurants were no accident.

To the extent Martinez's deposition had any bearing on Cheung's involvement in the conspiracy, moreover, it helped Cheung. Martinez testified that, although he had worked at the restaurant for 20 days, he saw Cheung there just once (and never anywhere else). Otherwise, the deposition contained little information—due to the brevity of Martinez's employment with the restaurant and due to the reality that Martinez spoke Zapotec, making it difficult for him to learn much from his co-workers and making it hard to communicate what little he knew through a Spanish-speaking interpreter. Because excluding the Martinez deposition would not have helped Cheung's case on the conspiracy charge, any error in admitting the deposition was harmless.

III.

For these reasons, we affirm.